**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Robert Alan THOMAS (94–6648) and**
**Carleen Thomas (94–6649),**
**Defendants–Appellants.**

**Nos. 94–6648 and 94–6649.**

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 11, 1995.

Decided Jan. 29, 1996.

Rehearing and Suggestion for Rehearing
En Banc Denied March 12, 1996.

Dan L. Newsom, Asst. U.S. Atty. (argued and briefed), Memphis, TN, for U.S.

Thomas J. Nolan (argued and briefed), Nolan & Armstrong, Palo Alto, CA, for Robert Alan Thomas.

James D. Causey (argued and briefed), Causey, Caywood, Taylor & McManus, Memphis, TN, for Carleen Thomas.

Christopher A. Hansen (briefed), American Civil Liberties Union Foundation, New York City, amicus curiae American Civil Liberties Union, American Civil Liberties Union of Northern California, American Civil Liberties Union of Tennessee, The National Writers Union, Feminists for Free Expression, Thomas Jefferson Center for the Protection of Free Expression.

Leonard J. Henzke, Jr. (briefed), Ginsburg, Feldman and Bress, Washington, DC, for amicus curiae Interactive Services Ass'n.

Raphael Winick (briefed), Latham & Watkins, New York City, amicus curiae Society for Electronic Access.

Shari Steele (briefed), Electronic Frontier Foundation, Washington, DC, amicus Curiae Electronic Frontior Foundation.

Bruce A. Taylor (briefed), National Law Center for Children and Families, Fairfax, VA, amicus curiae National Law Center for Children and Families, National Family Legal Foundation, Morality in Media, American Family Ass'n, Maryland Coalition Against Pornography, Family Research Council, Focus on the Family, National Coalition for the Protection of Children & Families, Enough is Enough.

Before: MARTIN and BATCHELDER, Circuit Judges; EDMUNDS, District Judge.*

EDMUNDS, District Judge.

Defendants Robert and Carleen Thomas appeal their convictions and sentences for violating 18 U.S.C. §§ 1462 and 1465, federal obscenity laws, in connection with their oper-

---

* The Honorable Nancy G. Edmunds, United States District Judge for the Eastern District of Michigan, sitting by designation.

ation of an electronic bulletin board. For the following reasons, we AFFIRM Robert and Carleen Thomas' convictions and sentences.

## I.

Robert Thomas and his wife Carleen Thomas began operating the Amateur Action Computer Bulletin Board System ("AABBS") from their home in Milpitas, California in February 1991. The AABBS was a computer bulletin board system that operated by using telephones, modems, and personal computers. Its features included e-mail, chat lines, public messages, and files that members could access, transfer, and download to their own computers and printers.

Information loaded onto the bulletin board was first converted into binary code, i.e., 0's and 1's, through the use of a scanning device. After purchasing sexually-explicit magazines from public adult book stores in California, Defendant Robert Thomas used an electronic device called a scanner to convert pictures from the magazines into computer files called Graphic Interchange Format files or "GIF" files. The AABBS contained approximately 14,000 GIF files. Mr. Thomas also purchased, sold, and delivered sexually-explicit videotapes to AABBS members. Customers ordered the tapes by sending Robert Thomas an e-mail message, and Thomas typically delivered them by use of the United Parcel Service ("U.P.S.").

Persons calling the AABBS without a password could view the introductory screens of the system which contained brief, sexually-explicit descriptions of the GIF files and adult videotapes that were offered for sale. Access to the GIF files, however, was limited to members who were given a password after they paid a membership fee and submitted a signed application form that Defendant Robert Thomas reviewed. The application form requested the applicant's age, address, and telephone number and required a signature.

Members accessed the GIF files by using a telephone, modem and personal computer. A modem located in the Defendants' home answered the calls. After they established membership by typing in a password, members could then select, retrieve, and instantly transport GIF files to their own computer. A caller could then view the GIF file on his computer screen and print the image out using his printer. The GIF files contained the AABBS name and access telephone number; many also had "Distribute Freely" printed on the image itself.

In July 1993, a United States Postal Inspector, Agent David Dirmeyer ("Dirmeyer"), received a complaint regarding the AABBS from an individual who resided in the Western District of Tennessee. Dirmeyer dialed the AABBS' telephone number. As a non-member, he viewed a screen that read "Welcome to AABBS, the Nastiest Place On Earth," and was able to select various "menus" and read graphic descriptions of the GIF files and videotapes that were offered for sale.

Subsequently, Dirmeyer used an assumed name and sent in $55 along with an executed application form to the AABBS. Defendant Robert Thomas called Dirmeyer at his undercover telephone number in Memphis, Tennessee, acknowledged receipt of his application, and authorized him to log-on with his personal password. Thereafter, Dirmeyer dialed the AABBS's telephone number, logged-on and, using his computer/modem in Memphis, downloaded the GIF files listed in counts 2–7 of the Defendants' indictments. These GIF files depicted images of bestiality, oral sex, incest, sado-masochistic abuse, and sex scenes involving urination. Dirmeyer also ordered six sexually-explicit videotapes from the AABBS and received them via U.P.S. at a Memphis, Tennessee address. Dirmeyer also had several e-mail and chat-mode conversations with Defendant Robert Thomas.

On January 10, 1994, a search warrant was issued by a U.S. Magistrate Judge for the Northern District of California. The AABBS' location was subsequently searched, and the Defendants' computer system was seized.

On January 25, 1994, a federal grand jury for the Western District of Tennessee returned a twelve-count indictment charging Defendants Robert and Carleen Thomas with the following criminal violations: one count under 18 U.S.C. § 371 for conspiracy

to violate federal obscenity laws—18 U.S.C. §§ 1462, 1465 (Count 1), six counts under 18 U.S.C. § 1465 for knowingly using and causing to be used a facility and means of interstate commerce—a combined computer/telephone system—for the purpose of transporting obscene, computer-generated materials (the GIF files) in interstate commerce (Counts 2–7), three counts under 18 U.S.C. § 1462 for shipping obscene videotapes via U.P.S. (Counts 8–10), one count of causing the transportation of materials depicting minors engaged in sexually explicit conduct in violation of 18 U.S.C. § 2252(a)(1) as to Mr. Thomas only (Count 11), and one count of forfeiture under 18 U.S.C. § 1467 (Count 12).

Both Defendants were represented by the same retained counsel, Mr. Richard Williams of San Jose, California. They appeared twice in federal district court for the Northern District of California, San Jose division, before being arraigned on March 15, 1994, in federal court in Memphis, Tennessee. They did not retain local counsel for the Tennessee criminal prosecution. Both Defendants were tried by a jury in July, 1994. Defendant Robert Thomas was found guilty on all counts except count 11 (child pornography). Defendant Carleen Thomas was found guilty on counts 1–10. The jury also found that the Defendants' interest in their computer system should be forfeited to the United States. Robert and Carleen Thomas were sentenced on December 2, 1994 to 37 and 30 months of

incarceration, respectively. They filed their notices of appeal on December 9, 1994.

## II.

### A.

■ Defendants contend that their conduct, as charged in counts 1–7 of their indictments, does not constitute a violation of 18 U.S.C. § 1465. This presents a question of statutory interpretation, a matter of law, and is reviewed by this court under a *de novo* standard. *United States v. Hans,* 921 F.2d 81, 82 (6th Cir.1990).[1]

Defendants' challenge to their convictions under counts 1–7, rests on two basic premises: 1) Section 1465 does not apply to intangible objects like the computer GIF files at issue here,[2] and 2) Congress did not intend to regulate computer transmissions such as those involved here because 18 U.S.C. § 1465 does not expressly prohibit such conduct.

In support of their first premise, Defendants cite a Tenth Circuit dial-a-porn decision which holds that 18 U.S.C. §§ 1462 and 1465 prohibit the interstate transportation of tangible objects; not intangible articles like pre-recorded telephone messages. *See United States v. Carlin Commun., Inc.,* 815 F.2d 1367, 1371 (10th Cir.1987). Defendants claim *Carlin* is controlling because transmission of the GIF files at issue under counts 1–7 involved an intangible string of 0's and 1's

---

1. Defendants assert that an appellate court is required to conduct an independent review of the entire record to ensure that their First Amendment rights are protected. *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 505, 104 S.Ct. 1949, 1962, 80 L.Ed.2d 502 (1984). It is true that in *Bose,* the United States Supreme Court recognized that an appellate court is to conduct an independent review of the record when constitutional facts are at issue, i.e., actual malice in a libel case or the finding of obscenity in pornography cases. There is no need to conduct an independent review when constitutional facts are not at issue. Accordingly, this first issue, which involves only statutory interpretation is reviewed under a *de novo* standard.

2. Section 1465 provides:

  Whoever knowingly transports in interstate or foreign commerce for the purpose of sale or

distribution, or knowingly travels in interstate commerce, or uses a facility or means of interstate commerce for the purpose of transporting obscene material in interstate or foreign commerce, any obscene, lewd, lascivious, or filthy book, pamphlet, picture, film, paper, letter, writing, print, silhouette, drawing, figure, image, cast, phonograph recording, electrical transcription or other article capable of producing sound or any other matter of indecent or immoral character, shall be fined under this title or imprisoned not more than five years, or both.

  The transportation as aforesaid of two or more copies of any publication or two or more of any article of the character described above, or a combined total of five such publications and articles, shall create a presumption that such publications or articles are intended for sale or distribution, but such presumption is rebuttable. 42 U.S.C.A. § 1465 (West 1995 Supp.).

which became viewable images only after they were decoded by an AABBS member's computer. We disagree.

■ The subject matter in *Carlin*—telephonic communication of pre-recorded sexually suggestive comments or proposals—is inherently different from the obscene computer-generated materials that were electronically transmitted from California to Tennessee in this case. Defendants erroneously conclude that the GIF files are intangible, and thus outside the scope of § 1465, by focusing solely on the manner and form in which the computer-generated images are transmitted from one destination to another. *United States v. Gilboe*, 684 F.2d 235 (2nd Cir.1982), *cert. denied*, 459 U.S. 1201, 103 S.Ct. 1185, 75 L.Ed.2d 432 (1983), illustrates this point.

In *Gilboe*, the Second Circuit rejected the argument that the defendant's transmission of electronic impulses could not be prosecuted under a criminal statute prohibiting the transportation of money obtained by fraud. The *Gilboe* court reasoned that:

> [e]lectronic signals in this context are the means by which funds are transported. The beginning of the transaction is money in one account and the ending is money in another. The manner in which the funds were moved does not affect the ability to obtain tangible paper dollars or a bank check from the receiving account.

*Id.* at 238. The same rationale applies here. Defendants focus on the means by which the GIF files were transferred rather than the fact that the transmissions began with computer-generated images in California and ended with the same computer-generated images in Tennessee. The manner in which the images moved does not affect their ability to be viewed on a computer screen in Tennessee or their ability to be printed out in hard copy in that distant location.

■ The record does not support Defendants' argument that they had no knowledge, intent or expectation that members of their AABBS would download and print the images contained in their GIF files. They ran a business that advertised and promised its members the availability and transportation of the sexually-explicit GIF files they selected. In light of the overwhelming evidence produced at trial, it is spurious for Defendants to claim now that they did not intend to sell, disseminate, or share the obscene GIF files they advertised on the AABBS with members outside their home and in other states.

■ We also disagree with Defendants' corollary position, raised at oral argument, that they were prosecuted under the wrong statute and that their conduct, if criminal at all, falls within the prohibitions under 47 U.S.C. § 223(b)[3] rather than 18 U.S.C. § 1465. As recognized by the Supreme Court, Section 223(b) of the Communications Act of 1934, was drafted and enacted by Congress in 1982 "explicitly to address 'dial-a-porn.'" *Sable Communications of Cal., Inc. v. F.C.C.*, 492 U.S. 115, 120–121, 109 S.Ct. 2829, 2833, 106 L.Ed.2d 93 (1989). Congress amended Section 223(b) in 1988 to impose a total ban "on dial-a-porn, making it illegal for adults, as well as children, to have access to sexually-explicit messages" that are indecent or obscene. *Id.* at 122–123, 109 S.Ct. at 2834–35.[4] 47 U.S.C. § 223(b) addresses commercial dial-a-porn operations that communicate sexually-explicit telephone messages; not commercial computer bulletin boards that use telephone facilities for the purpose of transmitting obscene, computer-generated images to approved members.

---

**3.** 47 U.S.C. § 223(b) provides:
(1) Whoever knowingly
(A) within the United States, by means of telephone, makes (directly or by recording device) any obscene communication for commercial purposes to any person, regardless of whether the maker of such communication placed the call; or
(B) permits any telephone facility under such person's control to be used for an activity prohibited by subparagraph (A),
shall be fined in accordance with Title 18, or imprisoned not more than two years, or both.

**4.** In *Sable*, the Supreme Court affirmed the lower court's decision which upheld Section 223(b)'s "prohibition against obscene interstate telephone communications for commercial purposes, but enjoined the enforcement of the statute insofar as it applied to indecent messages." *Id.* at 117, 109 S.Ct. at 2832.

Defendants' second premise, that Congress did not intend to regulate computer transmissions because the statute does not expressly prohibit such conduct, is faulty as well. We have consistently recognized that when construing federal statutes, our duty is to "'construe the language so as to give effect to the intent of Congress.'" *United States v. Underhill*, 813 F.2d 105, 111 (6th Cir.), *cert. denied*, 482 U.S. 906, 107 S.Ct. 2484, 96 L.Ed.2d 376 (1987) (quoting *United States v. American Trucking Associations, Inc.*, 310 U.S. 534, 542–44, 60 S.Ct. 1059, 1063–64, 84 L.Ed. 1345 (1940)). The Supreme Court observed this principle when it rejected an argument similar to one Defendants raise here, i.e., that Congress could not possibly have intended to include conduct not expressly prohibited in the statute. *See United States v. Alpers*, 338 U.S. 680, 70 S.Ct. 352, 94 L.Ed. 457 (1950).

In *United States v. Alpers*, the Supreme Court considered the question whether obscene phonograph records—at the time, a novel means of transmitting obscenity—came within the prohibition of 18 U.S.C. § 1462. Initially, the Court acknowledged that criminal statutes are to be strictly construed and that "no offense may be created except by the words of Congress used in their usual and ordinary way." *Id.* at 681, 70 S.Ct. at 353. The Court emphasized, however, that Congress' intent is the most important determination and statutory language is not to be construed in a manner that would defeat that intent.

Applying those principles, the Court held that the rule of *ejusdem generis*[5] should not be "employed to render general words meaningless" or "be used to defeat the obvious purpose of legislation." *Id.* at 681–83, 70 S.Ct. at 354. It recognized that "[t]he obvious purpose of [Section 1462] was to prevent the channels of interstate commerce from being used to disseminate" any obscene matter. *Id.* at 683, 70 S.Ct. at 354. The Court further recognized that Section 1462 "is a comprehensive statute, which should not be constricted by a mechanical rule of construction." *Id.* at 684, 70 S.Ct. at 354. Accord-

ingly, the Court rejected the defendant's argument that the general words "other matter of indecent character" could not be interpreted to include objects comprehensible by hearing (phonographic recordings) rather than sight; an argument similar to the tangible/intangible one raised here, and held that obscene records fell within the scope of the criminal statute.

■ In reaching its decision, the *Alpers* Court found that the legislative history of Section 1462 did not support defendant's sight/sound distinction. It was not persuaded that Congress' amendment of Section 1462 to add motion picture films to the list of prohibited materials "evidenced an intent that obscene matter not specifically added was without the prohibition of the statute." *Id.* Rather, the Court concluded that the amendment evidenced Congress' preoccupation "with making doubly sure that motion-picture film was within the Act, and was concerned with nothing more or less." *Id.* We are similarly unpersuaded by Defendants' arguments that the absence of the words "including by computer" in Section 1465, despite Congress' addition of those words in other legislation, is evidence of its intent not to criminalize conduct, such as Defendants' that falls within the plain language and intent of Section 1465.

Furthermore, under similar facts, the U.S. Air Force Court of Criminal Appeals recently considered § 1465's plain language and its intended purpose. In *United States v. Maxwell*, 42 M.J. 568 (A.F.Ct.Crim.App.1995), a defendant was charged with violating Section 1465 because he had transmitted obscene visual images electronically through the use of an on-line computer service. He argued that since the statute is silent concerning computer transmissions, such transmissions were not to be included within the terms "transporting obscene materials in interstate or foreign commerce." The court observed that well-established principles of statutory construction require a court to look first to the statute's plain language. *Maxwell*, 42 M.J. at 580 (citing *Rubin v. United States*, 449 U.S. 424, 430, 101 S.Ct. 698, 701–02, 66

---

5. This rule of statutory construction "limits general terms which follow specific ones to matters similar to those specified." *Alpers*, 338 U.S. at 683, 70 S.Ct. at 354.

L.Ed.2d 633 (1981)). Applying that principle, the *Maxwell* court concluded that the defendant's conduct fell within the plain language of Section 1465. Specifically, the court held:

> [t]he use of the terms "transports," "distribution," "picture," "image" and "electrical transcription" leads us to the inescapable conclusion the statute is fully applicable to the activities engaged in by applicant.... It is clear Congress intended to stem the transportation of obscene material in interstate commerce regardless of the means used to effect that end.

*Maxwell,* 42 M.J. at 580.

Likewise, we conclude that Defendants' conduct here falls within the plain language of Section 1465.[6] Moreover, our interpretation of Section 1465 is consistent with Congress' intent to legislate comprehensively the interstate distribution of obscene materials. *Id.*

**B.**

■ Defendants also challenge venue in the Western District of Tennessee for counts 2–7 of their indictments. They argue that even if venue was proper under count 1 (conspiracy) and counts 8–10 (videotapes sent via U.P.S.), counts 2–7 (GIF files) should have been severed and transferred to California because Defendants did not cause the GIF files to be transmitted to the Western District of Tennessee. Rather, Defendants assert, it was Dirmeyer, a government agent, who, without their knowledge, accessed and downloaded the GIF files and caused them to enter Tennessee. We disagree. To establish a Section 1465 violation, the Government must prove that a defendant knowingly used a facility or means of interstate commerce for the purpose of distributing obscene materials. Contrary to Defendants' position, Section 1465 does not require the Government to prove that Defendants had specific knowledge of the destination of each transmittal at the time it occurred.

■ "Venue lies in any district in which the offense was committed," and the Government is required to establish venue by a preponderance of the evidence. *United States v. Beddow,* 957 F.2d 1330, 1335 (6th Cir.1992) (quoting *United States v. Williams,* 788 F.2d 1213, 1215 (6th Cir.1986)). This court examines the propriety of venue by taking " 'into account a number of factors—the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of each district for accurate fact finding ...' " *Id.*

Section 1465 is an obscenity statute, and federal obscenity laws, by virtue of their inherent nexus to interstate and foreign commerce, generally involve acts in more than one jurisdiction or state. Furthermore, it is well-established that "there is no constitutional impediment to the government's power to prosecute pornography dealers in any district into which the material is sent." *United States v. Bagnell,* 679 F.2d 826, 830 (11th Cir.1982), *cert. denied,* 460 U.S. 1047, 103 S.Ct. 1449, 75 L.Ed.2d 803 (1983); *United States v. Peraino,* 645 F.2d 548, 551 (6th Cir.1981). Thus, the question of venue has become one of legislative intent. *Bagnell,* 679 F.2d at 830.

The *Bagnell* court examined both §§ 1462 and 1465 and found that each statute established a continuing offense within the venue provisions of 18 U.S.C. § 3237(a) "that occur[s] in every judicial district which the material touches." *Id.* at 830. This court likewise recognized that "venue for federal obscenity prosecutions lies 'in any district from, through, or into which' the allegedly obscene material moves." *Peraino,* 645 F.2d at 551 (citing 18 U.S.C. § 3237).

■ Substantial evidence introduced at trial demonstrated that the AABBS was set up so members located in other jurisdictions could access and order GIF files which would then be instantaneously transmitted in interstate commerce. Moreover, AABBS materials were distributed to an approved AABBS member known to reside in the Western

---

6. Our holding here renders moot Defendants' arguments that the district court's instructions on conspiracy were erroneous because they allowed for a conviction based upon a conspiracy to commit conduct wrongfully charged in counts 2–7 of their indictments.

District of Tennessee. Specifically, Defendant Robert Thomas knew of, approved, and had conversed with an AABBS member in that judicial district who had his permission to access and copy GIF files that ultimately ended up there. Some of these GIF files were clearly marked "Distribute Freely." In light of the above, the effects of the Defendants' criminal conduct reached the Western District of Tennessee, and that district was suitable for accurate fact-finding. Accordingly, we conclude venue was proper in that judicial district.

### C.

Defendants further argue that their convictions under counts 1–7 of their indictments violate their First Amendment rights to freedom of speech. As the Supreme Court noted in *Bose,* when constitutional facts[7] are at issue, this court has a duty to conduct an independent review of the record "both to be sure that the speech in question actually falls within the unprotected category and to confine the perimeters of any unprotected category within acceptably narrow limits in an effort to ensure that protected expression will not be inhibited." *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 505, 104 S.Ct. 1949, 1962, 80 L.Ed.2d 502 (1984).

### 1. Defendants' Right to Possess the GIF Files in their Home

Defendants rely on *Stanley v. Georgia,* 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), and argue they have a constitutionally protected right to possess obscene materials in the privacy of their home. They insist that the GIF files containing sexually-explicit material never left their home. Defendants' reliance on *Stanley* is misplaced.

The Supreme Court has clarified that *Stanley* "depended not on any First Amendment Right to purchase or possess obscene materials, but on the right to privacy in the home." *United States v. 12 200–Ft. Reels of Super 8mm. Film,* 413 U.S. 123, 126, 93 S.Ct. 2665, 2668, 37 L.Ed.2d 500 (1973). It has also recognized that the right to possess obscene materials in the privacy of one's home does not create "a correlative right to receive it, transport it, or distribute it" in interstate commerce even if it is for private use only. Nor does it create "some zone of constitutionally protected privacy [that] follows such material when it is moved outside the home area." *United States v. Orito,* 413 U.S. 139, 141–42, 93 S.Ct. 2674, 2677, 37 L.Ed.2d 513 (1973); *see also 12 200–Ft. Reels,* 413 U.S. at 128, 93 S.Ct. at 2669.

■ Defendants went beyond merely possessing obscene GIF files in their home. They ran a business that advertised and promised its members the availability and transportation of the sexually-explicit GIF files they selected. In light of the overwhelming evidence produced at trial, it is spurious for Defendants to claim now that they did not intend to sell, disseminate, or share the obscene GIF files they advertised on the AABBS with members outside their home and in other states.

### 2. The Community Standards to be Applied When Determining Whether the GIF Files Are Obscene

In *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), the Supreme Court set out a three-prong test for obscenity. It inquired whether (1) " 'the average person applying contemporary community standards' would find that the work, taken as a whole appeals to the prurient interest"; (2) it "depicts or describes, in a patently offensive way, sexual conduct specifically defined by applicable state law"; and (3) "the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." *Id.* at 24, 93 S.Ct. at 2615.

■ Under the first prong of the *Miller* obscenity test, the jury is to apply "contemporary community standards." Defendants acknowledge the general principle that, in

---

7. Some examples of constitutional facts include those that support: the finding of actual malice in a defamation or libel suit; the finding that obscene materials were used solely in the home and were thus protected under *Stanley v. Geor-* gia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), or the finding that material is obscene under the test for obscenity set forth in *Miller v. California,* 413 U.S. 15, 24, 93 S.Ct. 2607, 2614–15, 37 L.Ed.2d 419 (1973).

cases involving interstate transportation of obscene material, juries are properly instructed to apply the community standards of the geographic area where the materials are sent. *Miller,* 413 U.S. at 15, 30–34, 93 S.Ct. at 2610, 2618–20. Nonetheless, Defendants assert that this principle does not apply here for the same reasons they claim venue was improper. As demonstrated above, this argument cannot withstand scrutiny. The computer-generated images described in counts 2–7 were electronically transferred from Defendants' home in California to the Western District of Tennessee. Accordingly, the community standards of that judicial district were properly applied in this case.

Issues regarding which community's standards are to be applied are tied to those involving venue. It is well-established that:

> [v]enue for federal obscenity prosecutions lies "in any district from, through, or into which" the allegedly obscene material moves, according to 18 U.S.C. § 3237. This may result in prosecutions of persons in a community to which they have sent materials which is *obscene* under that community's standards though the community from which it is sent would tolerate the same material.

*United States v. Peraino,* 645 F.2d 548, 551 (6th Cir.1981). Prosecutions may be brought either in the district of dispatch or the district of receipt, *Bagnell,* 679 F.2d at 830–31, and obscenity is determined by the standards of the community where the trial takes place. *See Miller,* 413 U.S. at 15, 30–34, 93 S.Ct. at 2610, 2618–20; *Hamling v. United States,* 418 U.S. 87, 105–6, 94 S.Ct. 2887, 2901–02, 41 L.Ed.2d 590 (1974); *Sable,* 492 U.S. at 125, 109 S.Ct. at 2836. Moreover, the federal courts have consistently recognized that it is not unconstitutional to subject interstate distributors of obscenity to varying community standards. *Hamling,* 418 U.S. at 106, 94 S.Ct. at 2901–02; *United States v. Sandy,* 605 F.2d 210, 217 (6th Cir.), *cert. denied,* 444 U.S. 984, 100 S.Ct. 490, 62 L.Ed.2d 412 (1979).

### 3. The Implications of Computer Technology on the Definition of "Community"

Defendants and *Amicus Curiae* appearing on their behalf [8] argue that the computer technology used here requires a new definition of community, i.e., one that is based on the broad-ranging connections among people in cyberspace rather than the geographic locale of the federal judicial district of the criminal trial. Without a more flexible definition, they argue, there will be an impermissible chill on protected speech because BBS operators cannot select who gets the materials they make available on their bulletin boards. Therefore, they contend, BBS operators like Defendants will be forced to censor their materials so as not to run afoul of the standards of the community with the most restrictive standards.

Defendants' First Amendment issue, however, is not implicated by the facts of this case. This is not a situation where the bulletin board operator had no knowledge or control over the jurisdictions where materials were distributed for downloading or printing. Access to the Defendants' AABBS was limited. Membership was necessary and applications were submitted and screened before passwords were issued and materials were distributed. Thus, Defendants had in place methods to limit user access in jurisdictions where the risk of a finding of obscenity was greater than that in California. They knew they had a member in Memphis; the member's address and local phone number were provided on his application form. If Defendants did not wish to subject themselves to liability in jurisdictions with less tolerant standards for determining obscenity, they could have refused to give passwords to members in those districts, thus precluding the risk of liability.

This result is supported by the Supreme Court's decision in *Sable Communications of Cal., Inc. v. F.C.C.* where the Court rejected Sable's argument that it should not be compelled to tailor its dial-a-porn messages to the standards of the least tolerant communi-

---

**8.** The following *Amicus Curiae* submitted briefs on behalf of Defendants in this matter: the American Civil Liberties Union, the Interactive Services Association, the Society for Electronic Access, and The Electronic Frontier Foundation.

ty. 492 U.S. 115, 125–26, 109 S.Ct. 2829, 2836–37, 106 L.Ed.2d 93 (1989). The Court recognized that distributors of allegedly obscene materials may be subjected to the standards of the varying communities where they transmit their materials, citing *Hamling,* and further noted that Sable was "free to tailor its messages, on a selective basis, if it so chooses, to the communities it chooses to serve." *Id.* at 125, 109 S.Ct. at 2836. The Court also found no constitutional impediment to forcing Sable to incur some costs in developing and implementing a method for screening a customer's location and "providing messages compatible with community standards." *Id.*

Thus, under the facts of this case, there is no need for this court to adopt a new definition of "community" for use in obscenity prosecutions involving electronic bulletin boards. This court's decision is guided by one of the cardinal rules governing the federal courts, i.e., never reach constitutional questions not squarely presented by the facts of a case. *Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491, 502, 105 S.Ct. 2794, 2801, 86 L.Ed.2d 394 (1985).

### D.

■ Defendants next raise a number of challenges to the jury instructions given at their trial. Initially, they claim that, as to counts 2, 3, 6 and 9, the district court should have included an augmented unanimity instruction because those counts involved more than one GIF file or videotape. The district court instructed the jury that "[i]f more than one article is alleged to be obscene in a particular count, the government is required to show only that one of these articles was obscene." There was no request for an augmented unanimity instruction and there was no objection at trial to the instruction given. The issue was raised for the first time at sentencing. Accordingly, this court reviews for plain error. *United States v. Mendez–Ortiz,* 810 F.2d 76 (6th Cir.1986), *cert. denied,* 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 697 (1987).

We have recognized that "[t]he plain error doctrine is to be used 'only in exceptional circumstances' and only where the error is so

plain that 'the trial judge and the prosecutor were derelict in countenancing it.'" *Id.* at 78. Moreover, "[w]e consider whether the instructions, when taken as a whole, were so clearly wrong as to produce a grave miscarriage of justice." *United States v. Sanderson,* 966 F.2d 184, 187 (6th Cir.1992).

■ When one count of an indictment charges that a defendant committed an offense by "multiple alternative 'conceptually' distinct acts," the defendant can request that the court give the jury an augmented unanimity instruction, i.e., one that tells them that, with regard to this particular count, they must all agree that the defendant committed one of those distinct acts. *United States v. Duncan,* 850 F.2d 1104, 1110 (6th Cir.1988). With regard to specific, or augmented unanimity instructions, this court has recognized that the instruction is not necessary "unless 1) a count is extremely complex, 2) there is variance between the indictment and the proof at trial, or 3) there is a tangible risk of jury confusion." *Sanderson,* 966 F.2d at 187. Contrary to Defendants' assertions, this court's decision in *Duncan* does not require a court to *sua sponte* instruct the jury on specific unanimity when more than one basis for conviction is presented in a single count. Rather, we have consistently recognized that the need arises when it is shown that there is a "genuine risk that the jury is confused or that a conviction may occur as the result of different jurors concluding that a defendant committed different acts." *United States v. Sims,* 975 F.2d 1225, 1241 (6th Cir.1992), *cert. denied,* 507 U.S. 932, 113 S.Ct. 1315, 122 L.Ed.2d 702 (1993).

In *Duncan,* the court held that an augmented unanimity instruction should have been given because the court had been apprised of the unanimity problem in pretrial motions and by "a mid-deliberation question from the jury raising the genuine possibility that conviction could occur as the result of different jurors using a different false statement as the underlying factual predicate for guilt." *Duncan,* 850 F.2d at 1105. Defendants have not demonstrated that there was a tangible risk of jury confusion here. Thus, this case is easily distinguished from *Duncan.*

Furthermore, counts 2, 3, 6 and 9 were not complex, and there was no variance between the indictment and the proof at trial. Accordingly, none of the circumstances existed that would give rise to the need for a specific unanimity instruction. Consequently, we conclude that the district court did not commit error when it gave general instructions on unanimity. Furthermore, considering the subject matter of each GIF file and videotape listed in counts 2, 3, 6 and 9, we find it unlikely that the jury would have had any trouble reaching unanimity on the fact that one item described in each of those counts was obscene.

### E.

■■■ We next address the Defendants' argument that the district court erred when it instructed the jury that the government was not required to present expert testimony regarding the prurient appeal of the materials at issue here.[9] Under the first prong of the *Miller* obscenity test, the jury must consider whether the allegedly obscene material "appeals to the prurient interest." *Miller*, 413 U.S. at 24, 93 S.Ct. at 2615.

The computer-generated images and videotapes involved here portrayed bestiality, incest, rape, and sex scenes involving defecation, urination, and sado-masochistic abuse. Defendants argue that the Government is required to present expert testimony when sexually-explicit material is directed at a deviant group. We disagree. Neither the United States Supreme Court nor this court has adopted any such *per se* rule.

The Supreme Court has consistently recognized that "[e]xpert testimony is not necessary to enable the jury to judge the obscenity of material which ... has been placed into evidence." *Hamling v. United States*, 418 U.S. 87, 100, 94 S.Ct. 2887, 2899, 41 L.Ed.2d 590 (1974) (citing *Paris Adult Theatre I v.*

*Slaton*, 413 U.S. 49, 56, 93 S.Ct. 2628, 2634–35, 37 L.Ed.2d 446 (1973), *Kaplan v. California*, 413 U.S. 115, 120–21, 93 S.Ct. 2680, 2684–2685, 37 L.Ed.2d 492 (1973), *Ginzburg v. United States*, 383 U.S. 463, 465, 86 S.Ct. 942, 944–45, 16 L.Ed.2d 31 (1966)). In *Paris Adult Theatre I*, the Court observed that the allegedly obscene materials, "obviously, are the best evidence of what they represent" and have been consistently recognized as " 'sufficient in themselves for the determination of the question.' " 413 U.S. at 56, 93 S.Ct. at 2634–35 (quoting *Ginzburg*, 383 U.S. at 465, 86 S.Ct. at 944). The *Paris I* Court further elaborated that:

> [t]his is not a subject that lends itself to the traditional use of expert testimony. Such testimony is usually admitted for the purpose of explaining to lay jurors what they otherwise could not understand. No such assistance is needed by jurors in obscenity cases; indeed the "expert witness" practices employed in these cases have often made a mockery out of the otherwise sound concept of expert testimony.

*Id.* at 56, n. 6, 93 S.Ct. at 2634, n. 6 (citations omitted).

The Court has explicitly reserved judgment on the issue whether expert testimony is required in the "extreme case" where "contested materials are directed at such a bizarre deviant group that the experience of the trier of fact would be plainly inadequate to judge whether the material appeals to the prurient interest." *Id.* In *Pinkus v. United States*, 436 U.S. 293, 98 S.Ct. 1808, 56 L.Ed.2d 293 (1978), the Court once again reserved judgment on this question, finding that it was not presented with the "extreme case" referenced in *Paris I* because there was expert testimony in evidence which, when "combined with the exhibits themselves, sufficiently guided the jury." *Pinkus*, 436 U.S. at 303, 98 S.Ct. at 1815.

---

9. The district court instructed the jury as follows:
   You have heard testimony from an expert witness presented on behalf of the defendants. An expert is allowed to express his opinion on those matters about which he has special knowledge and training. Expert testimony is presented to you on the theory that someone that is experienced in the field can assist you in understanding the evidence or in reaching an independent decision on the facts. There is no requirement, however, that expert testimony be presented in an obscenity case. The government need not produce expert evidence that the materials are obscene, but may rely on the computer generated images and videotapes themselves for its argument that the materials are obscene.

Expert testimony on prurient appeal to deviant groups was also presented in this case. Defendants' expert, Dr. Victor Pascale, a licensed clinical psychologist, testified at trial about how certain groups of individuals can become sexually aroused by objects or conduct not normally thought of as sexual in nature, i.e., the use of whips, cross-dressing, urination, defecation, infliction of pain (sado-masochism), and voyeurism. Thus, as in *Pinkus*, we find that the expert testimony, when combined with the allegedly obscene materials themselves, was sufficient to guide the jury with regard to prurient appeal.

Defendants rely heavily on decisions from the Second Circuit. *See United States v. Klaw*, 350 F.2d 155 (2nd Cir.1965); *United States v. Petrov*, 747 F.2d 824 (2nd Cir.1984), *cert. denied*, 471 U.S. 1025, 105 S.Ct. 2037, 85 L.Ed.2d 318 (1985). In *Petrov*, however, the court concluded that *Klaw* is "properly understood to require expert testimony that material appeals to the prurient interest of a deviant group only when the material portrays conduct not generally understood to be sexual." *Id.* at 836. Furthermore, the *Petrov* court concluded that expert testimony is "not required to establish the prurient appeal of photographs depicting bestiality." *Id.* at 837. The court further clarified that although *Klaw* required expert testimony on depictions of sado-masochistic activity, the requirement was met where the defendant's expert testified on cross-examination that such materials would appeal to the sexual interest of a small minority of individuals even though they would not appeal to the average person. *Id.* at 830–31. Thus, *Petrov* does not compel a different result, and this court concludes that the challenged jury instruction was not erroneous.

### F.

■ A required element of § 1465 is that the defendant knowingly "used a facility or means of interstate commerce" for the purpose of transporting or transmitting obscene material. Defendants argue that the district court's instruction, that "facility or means of interstate commerce" includes "any method of communication between different states," improperly expanded the meaning of this criminal statute. Defendants failed to object to the instruction, therefore, it is examined for plain error. We conclude that there is no plain error here.

Contrary to Defendants' argument, the instruction finds support in 2 Devitt, Blackmar and O'Malley, *Federal Jury Practice and Instruction, Criminal,* (4th Ed.1990), § 46.06 at 664, which provides:

The term "uses any facility in interstate ... commerce" means employing or utilizing any method of communication or transportation between one state and another. The term "uses any facility in interstate ... commerce", for example, includes the use of the telephone and mails.

### G.

■ Defendants claim they were denied due process of law and a fair trial by the admission of uncharged GIF files and descriptions of uncharged materials at their trial. We will not disturb the district court's admission of this evidence and its determinations of relevancy absent a clear abuse of discretion. *United States v. Seago*, 930 F.2d 482, 494 (6th Cir.1991). We also apply an abuse of discretion standard to the district court's decision in balancing the potentially unfair prejudicial impact of evidence against its probative value. *United States v. Feinman*, 930 F.2d 495, 499 (6th Cir.1991). In reviewing how such a balance is weighed, "the appellate court must view the evidence in the light most favorable to its proponent, giving 'the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value.'" *United States v. Moore*, 917 F.2d 215, 233 (6th Cir.1990), *cert. denied*, 499 U.S. 963, 111 S.Ct. 1590, 113 L.Ed.2d 654 (1991).

Defendants complain that the district court erred when it allowed the Government to introduce 31 uncharged GIF files, portions of 2 uncharged videos, and the AABBS' descriptions of uncharged GIF files and videotapes at trial. They assert that the material had no probative value, and its introduction served only to unfairly prejudice the jury. Based on our review of the record, we find no abuse of discretion.

■ With regard to the videotapes, the record reveals that the district court considered whether the probative value of two minutes of one of the three "child nudist" videotapes sent by Defendant Robert Thomas to Dirmeyer was substantially outweighed by the danger of unfair prejudice. F.R.E. 401, 403. Despite an objection from Defendants' counsel, the district court ruled that the material was probative to the issue of Mr. Thomas' predisposition in light of his entrapment defense to count 11, charging him with knowing receipt of child pornography. We find no error in the admission of the videotapes since they were properly introduced in response to the entrapment defense.

■ Defendants' claim that the district court erred when it permitted the jury to see 31 uncharged GIF files is likewise without merit. Each of the GIF file images was made from the charged videotapes by stopping the tapes at a certain point, making a still frame or photograph, and then scanning it onto the AABBS and making it available for distribution as a separate item. Because the entire videotape was properly admitted and viewed by the jury, we reject Defendants' claim of unfair prejudice.

■ Defendants also complain that the district court erred by allowing the jury to hear sexually-explicit descriptions of other uncharged GIF files and videotapes. Contrary to Defendants' contention, this material did have probative value, i.e., it was relevant to establishing scienter and pandering. Defendants posted these graphic descriptions in the public areas of the AABBS, and this was one way they advertised for members. *See Mishkin v. New York*, 383 U.S. 502, 86 S.Ct. 958, 16 L.Ed.2d 56 (1966); *Pinkus,* 436 U.S. at 303, 98 S.Ct. at 1814–15. Accordingly, we reject Defendants' argument that the above evidence was clearly more prejudicial than probative under F.R.E. 403, and find no abuse of discretion in its admission under F.R.E. 401.

## H.

Defendants next contend that they were denied effective assistance of counsel at their trial because their retained counsel failed to: (1) move for dismissal based on *Carlin;* (2) object to the admission of evidence at trial; (3) move for judgment of acquittal based on the government's requirement to provide expert testimony regarding "prurient appeal" to deviant groups; (4) recognize the conflict of interest inherent in his dual representation of both Defendants; (5) sever the child pornography count; (6) file a suppression motion; (7) request discovery; (8) challenge the indictment as duplicative; (9) move for a mistrial; (10) submit a theory-of-the-case instruction; (11) introduce comparable sexually-explicit videotapes available in Memphis; and (12) with regard to Carleen Thomas, failed to move for a judgment of acquittal at the close of the government's case for lack of evidence of scienter and then called her to the stand when her testimony could only incriminate her.

■ As a general rule, this court "will not review claims of ineffective counsel that are raised for the first time on appeal." *United States v. Seymour,* 38 F.3d 261, 263 (6th Cir.1994). These claims are "'best brought by a defendant in a post-conviction proceeding under 28 U.S.C. § 2255 so that the parties can develop an adequate record on the issue.'" *Id.* (quoting *United States v. Daniel,* 956 F.2d 540, 543 (6th Cir.1992)). We consider such claims on direct appeal only where the record has been sufficiently developed so as to allow us to evaluate counsel's performance. *Seymour,* 38 F.3d at 263. We find that the record here is not adequately developed for us to consider the ineffective assistance of counsel claims asserted above.

■ We will, however, consider Defendant Carleen Thomas' argument that she was denied effective assistance of counsel because the district court refused her request for separate counsel without adequate inquiry as to her reasons. Unlike the above claims, we find the record below is sufficiently developed to address this issue.

Carleen Thomas first raised her request for separate counsel on the day of trial. The Government informed the district court that Defendants had previously been informed of their right to separate counsel but they had waived that right. While considering Carleen Thomas' late request, the district court made additional inquiries and reviewed the record to determine whether she had indeed been informed of, and had waived, that right.

The inquiry revealed both events had occurred. The district court refused to delay the trial that was set to begin immediately but did offer to arrange for separate standby counsel for Carleen Thomas. The court also informed Carleen Thomas that, because she was not indigent, she would have to reimburse this counsel at the rate charged by court-appointed attorneys. After considering the court's offer, Carleen Thomas stated on the record that she wished to continue with Mr. Williams as her retained counsel. In light of the above, we reject Carleen Thomas' claim.

## I.

Defendants' final argument challenges the district court's denial of a two-level reduction in their sentences for acceptance of responsibility. They claim they are entitled to the reduction because they fully acknowledged their conduct in running the AABBS. The sentencing court's finding regarding acceptance of responsibility is entitled to great deference and is reversed only if found to be clearly erroneous. *See United States v. Ivery,* 999 F.2d 1043, 1045 (6th Cir.1993); *see also* U.S.S.G. § 3E1.1(a), comment, n. 5.

U.S.S.G. § 3E1.1(a) provides for a two-level reduction for a defendant who "clearly demonstrates acceptance of responsibility." To qualify for this reduction, Defendants were required to show by a preponderance of the evidence that they had accepted responsibility for the crime committed. *United States v. Williams,* 940 F.2d 176 (6th Cir.), *cert. denied,* 502 U.S. 1016, 112 S.Ct. 666, 116 L.Ed.2d 757 (1991). U.S.S.G. 3E1.1(a), comment, n. 2 clarifies that the reduction is "not intended for a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." This comment further clarifies that only in "rare situations" will the adjustment apply after a trial and verdict of guilt, e.g., where the defendant makes a challenge to the applicability of a statute to his conduct. Defendants assert that they fit the "rare situation" and should not have been denied the reduction.

The sentencing judge, however, stated more than one ground for denying the two-level reduction. She noted that neither Defendant acknowledged the character of the materials found to be obscene. In addition, she found no indication that either of them had put aside making their living through the same means. U.S.S.G. § 3E1.1(a), comment n. 1(b) lists voluntary termination or withdrawal from criminal conduct as a factor to be considered by the court. This court has recognized that the two-level adjustment is properly denied under circumstances where the defendant continues conduct that is the same type as the underlying offense. *See United States v. Reed,* 951 F.2d 97, 99–100 (6th Cir.1991), *cert. denied,* 503 U.S. 996, 112 S.Ct. 1700, 118 L.Ed.2d 409 (1992); *United States v. Snyder,* 913 F.2d 300, 305 (6th Cir.1990), *cert. denied,* 498 U.S. 1039, 111 S.Ct. 709, 112 L.Ed.2d 698 (1991). Accordingly, we hold that the sentencing court's denial of the two-level reduction was not clearly erroneous.

## III.

For the foregoing reasons, this court AFFIRMS Robert and Carleen Thomas' convictions and sentences.